**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| THEODORE E. ROKITA,<br><br>*Plaintiff,*<br><br>v.<br><br>BERNARD A. CARTER, J. DAVID ROELLGEN, DENISE ROSE, PETER RUSTHOVEN, EDWARD A. SULLIVAN, III, DANIEL B. VINOVICH, TERRY A. WEBSTER, SR., CARA S. WIENEKE, and HOLLY WOJCIK, in their individual capacities and official capacities as Members of the Disciplinary Commission of the Supreme Court of Indiana; BRIAN K. CARROLL, MOLLY KITCHELL, JOHN L. KRAUSS, LEANNA K. WEISSMANN, and KIRK WHITE, former Members of the Disciplinary Commission of the Supreme Court of Indiana, in their individual capacities; ADRIENNE L. MEIRING, in her individual capacity and official capacity as Executive Director of the Disciplinary Commission of the Supreme Court of Indiana,<br><br>*Defendants.* | Civil Action No. 1:26-CV-2118 |

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES**

**TRIAL BY JURY DEMANDED**

## INTRODUCTION

1. This action challenges a sustained, multi-year campaign by the current and former Members of the Indiana Supreme Court Disciplinary Commission and its Executive Director to retaliate against, harass, and silence the Attorney General of Indiana, Theodore E. Rokita, for his constitutionally protected speech on matters of public concern and for petitioning for a redress of grievances. General Rokita asserts three retaliation claims under 42 U.S.C. § 1983—for the Commission's retaliation against his protected speech; for its retaliation against his protected petitioning; and for its public disclosure of confidential proceedings. General Rokita seeks declaratory relief; injunctive relief; and damages, including compensatory, nominal, and punitive damages.

2. Since 2022, the Commission has entertained a succession of facially meritless grievances against General Rokita—most provoked by his public commentary and advocacy on contested issues of law and policy—and has processed them according to a recurring method: It demands that he respond on pain of suspension of his law license and other discipline; opens an investigation that runs far longer than necessary, usually for the maximum period the Commission's rules allow; declines in the end to bring charges; and subjects him throughout to reputational injury, including through the public disclosure of confidential proceedings.

3. General Rokita does not forfeit the freedom of speech by serving as Attorney General or by holding a law license. The First Amendment forbids

government officials from retaliating against a speaker for protected speech, and it does not permit a disciplinary bureaucracy to be turned into an instrument for punishing an elected official's participation in public debate.

4. The Commission's conduct is not isolated error. It is a pattern—a succession of grievances since 2022 spanning at least six investigative matters, now joined by the grievances that are the most recent occasions for the same abusive process—administered with evident political animus and in bad faith, and marked by disparate treatment of General Rokita compared with similarly situated attorneys.

5. The Commission's abusive handling of the most recent grievance against General Rokita, the one filed by Jess Sampson, was the final straw necessitating this lawsuit. Sampson—whom the State of Indiana is proceeding against for multiple violations of Indiana's consumer-protection laws—bottomed his grievance on a response generated by artificial intelligence ("AI"). The Commission demanded that General Rokita respond to Sampson's AI-generated grievance or else be suspended from the practice of law and face further disciplinary action. Neither the grievance nor the Commission cited any Rule of Professional Conduct that Rokita allegedly violated. The demand by the Commission violated its own rule that no response shall be required if a grievance does not raise a "substantial question of misconduct," Ind. Admis. Disc. R. 23(10)(a)—which the Sampson grievance plainly does not.

6. General Rokita brings this action against the current Members of the Disciplinary Commission and its Executive Director, in their individual capacities for

damages arising from their disclosure of confidential disciplinary proceedings and in their official capacities for declaratory and injunctive relief, and against the former Members of the Commission in their individual capacities for damages arising from that disclosure, to obtain compensation for the injuries already inflicted, a declaration that the pattern of conduct violates the First Amendment, and an injunction against its continuation.

7. He brings the action now, and in advance of any formal docketing of the pending grievance, because controlling precedent requires a plaintiff to commence a federal action challenging an Indiana disciplinary proceeding before that proceeding advances beyond its initial phase. *See Crenshaw v. Sup. Ct. of Ind.*, 170 F.3d 725, 728 (7th Cir. 1999). No state disciplinary proceeding against General Rokita is now pending other than the Sampson grievance, which has not yet been docketed. (The Commission's letter demanding that Rokita respond to the Sampson grievance states that any "decision" to "docket the case" would be made only after General Rokita responds to the grievance and the Commission considers the response. Ex. A at A-1.) This action therefore does not ask the Court to enjoin any pending state disciplinary proceeding; it challenges the Commission's pattern of retaliation and seeks prospective relief directed at future conduct and the not-yet-docketed Sampson grievance, together with damages for completed violations.

## PARTIES

8. Plaintiff Theodore E. "Todd" Rokita is the Attorney General of Indiana. Indiana voters re-elected General Rokita to a second four-year term in November 2024. He is a member in good standing of the bar of the State of Indiana.

9. The Disciplinary Commission of the Supreme Court of Indiana is an agency of the Indiana Supreme Court created by that Court to investigate and prosecute allegations of attorney misconduct. *See* Ind. Admis. Disc. R. 23(6)(a).

10. The Disciplinary Commission is composed of nine persons appointed by the Indiana Supreme Court. *See* Ind. Admis. Disc. R. 23(6)(b). Under the Supreme Court's rules, seven of the Commission's members must be attorneys and two must not be. *Id.*

11. As of the filing of this Complaint, Defendants Bernard A. Carter, J. David Roellgen, Denise Rose, Peter Rusthoven, Edward A. Sullivan, III, Daniel B. Vinovich, Terry A. Webster, Sr., Cara S. Wieneke, and Holly Wojcik (collectively, the "Commissioners") are the Members of the Disciplinary Commission. Vinovich is the Chair of the Commission. Each of the Commissioners is sued in his or her official capacity for prospective declaratory and injunctive relief, and in his or her individual capacity for damages solely for participating in, authorizing, or facilitating the disclosure of confidential grievance and investigation materials to the public, as described below.

12. Defendants Brian K. Carroll, Molly Kitchell, John L. Krauss, Leanna K. Weissmann, and Kirk White (collectively, the "Former Commissioners") are former

Members of the Disciplinary Commission who sat on the Commission during the retaliation against General Rokita. Each of the Former Commissioners is sued in his or her individual capacity for damages, solely for participating in, authorizing, or facilitating the disclosure of confidential grievance and investigation materials to the public, as described below.

13. Defendant Adrienne L. Meiring is the Executive Director of the Disciplinary Commission. The Executive Director is appointed by the Commission with the approval of the Supreme Court, *see* Ind. Admis. Disc. R. 23(8)(a)(1), and has the power to administer the Commission's work and to supervise and direct the work of Commission staff, *id.* R. 23(9). She is sued in her official capacity for prospective declaratory and injunctive relief, and in her individual capacity for damages solely for participating in, authorizing, or facilitating the disclosure of confidential grievance and investigation materials to the public, as described below.

14. The current members of the Commission and the Executive Director are referred to collectively as the "Commission Defendants."

**JURISDICTION AND VENUE**

15. This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the First and Fourteenth Amendments, 42 U.S.C. § 1983.

16. This Court has authority to award the declaratory relief requested under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

17. The Commission Defendants are sued in their official capacities for prospective relief to remedy ongoing violations of federal law; the Eleventh Amendment does not bar such relief against state officials. *See Ex parte Young*, 209 U.S. 123, 159–60 (1908). General Rokita's claims for damages are asserted against the Defendants in their individual capacities, which the Eleventh Amendment does not bar.

18. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to General Rokita's claims occurred in this district.

19. This action is timely. General Rokita's claims under 42 U.S.C. § 1983 are governed by Indiana's two-year limitations period for personal-injury actions, *see* Ind. Code § 34-11-2-4(a). Each claim rests on the Commission Defendants' conduct within the applicable period, including the Sampson grievance (filed in December 2025 (*see* Ex. A at A-3)), the Brown grievance (filed in May 2025), the second disciplinary complaint (No. 25S-DI-29), and the continuing public disclosure of confidential proceedings.

20. The earlier grievances described below are pleaded as evidence of the Commission's pattern, motive, and bad faith—not as independent, time-barred claims for damages. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (a limitations bar does not preclude a plaintiff from using prior acts as background evidence in support of a timely claim). To the extent any challenged conduct would otherwise fall outside the limitations period, the period was tolled: the

Commission's proceedings are confidential, and the Commission concealed its retaliatory disclosures, so General Rokita's claims did not accrue until he discovered the concealed conduct, and Indiana's fraudulent-concealment statute independently tolls the period until discovery. *See* Ind. Code § 34-11-5-1.

## FACTUAL ALLEGATIONS AND RELEVANT LAW

### ***The Jess Sampson Grievance***

21. General Rokita brings this action in part because of the Commission's demand that he respond to the Sampson grievance. The Commission's demand constitutes unlawful retaliation for General Rokita's exercise of his First Amendment rights, including his right to petition the government for redress of grievances.

22. By letter dated July 29, 2026, the Commission issued to General Rokita "a demand for a written response" to the grievance filed by Sampson. *See* Exhibit A, Letter from Disciplinary Commission, at A-1. The Commission told General Rokita that he "could be suspended from the practice of law for failure to respond to this grievance and cooperate with our investigation" and that his "knowing failure to respond or failure to timely respond may subject [him] to disciplinary action … even in the absence of any other misconduct." *Id.*

23. In demanding that General Rokita respond to the grievance, the Commission's Executive Director, Defendant Meiring, necessarily concluded that that the Sampson grievance raised a "substantial question of misconduct." Ind. Admis. Disc. R. 23(10)(a). After a grievance is filed, the Commission's Rules authorize the Executive Director to "[d]ismiss the grievance, with subsequent approval by the

Disciplinary Commission, if the Executive Director determines that it raises no substantial question of misconduct." *Id.* R. 23(10)(a)(1). But, [i]f the Executive Director determines that the grievance raises a substantial question of misconduct that is not resolved under subsection (a)(2) [with a caution letter], the Executive Director shall send a copy of the grievance by certified mail to the respondent and shall demand a written response from the respondent." *Id.* R. 23(10)(a)(3). Here, Meiring did not dismiss the Sampson grievance but instead demanded that General Rokita respond to it.

24. Neither the Commission's July 29 letter (Ex. A at A-1), nor Sampson's grievance (Ex. A at A-3 to A-8) cited any rule of the Indiana Rules of Professional Conduct that General Rokita allegedly violated. Instead, Sampson's grievance—which he filed with the Commission on or about December 19, 2025 (*see* Ex. A at A-36), and was attached to the Commission's July 29, 2026 letter—attached a copy of the Complaint filed by the State of Indiana against him for alleged violations of the Indiana Deceptive Consumer Sales Act and the Regulation of Vehicle Merchandising Act. *See* Compl. for Inj., Restitution, Civ. Penalties, & Costs, *State v. Sampson*, No. 25D01-2512-PL-000903 (Ind. Super. Ct., Fulton Cnty. Dec. 4, 2025) (Ex. A at A-20 to A-35). The State's action against Sampson is ongoing.

25. Sampson's grievance included what he described as an "IA [*sic*] generated response to the following inquiry: May a state attorney general use his office to resolve his own personal debt or grievance?" Ex. A at A-4.

26. As Defendant Meiring and the current Commissioners knew or should have known, General Rokita has in no way "use[d] his office to resolve his own personal debt or grievance" in connection with *State v. Sampson*.

27. The Consumer Protection Division ("CPD") of the Office of the Indiana Attorney General filed a complaint against Sampson on behalf of the State of Indiana for alleged violations of the Indiana Deceptive Consumer Sales Act ("DCSA"), Ind. Code § 24-5-0.5-1 *et seq*., and the Regulation of Vehicle Merchandising Act, Ind. Code § 9-32-11-1 *et seq*. Ex. A at A-20. The Attorney General's office is tasked with enforcing such statutes on behalf of the State of Indiana pursuant to Indiana Code § 24-5-0.5-4(c). *See also* Ex. A at A-21. Such enforcement matters are routinely filed by the Attorney General on behalf of the State.

28. The purpose of the DCSA is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts" and "encourage the development of fair consumer sales practices." Ind. Code §§ 24-5-0.5-1(b)(1), (3). The DCSA provides certain remedies that are exclusively available to the Attorney General to combat potential consumer harms, such as imposition of injunctive relief and various civil penalties. *See id*. §§ 24-5-0.5-4(c), (g), (h).

29. As a consumer, Rokita brought his concerns about a transaction and interaction he had with Sampson to the attention of the CPD. CPD elected to investigate the matter and discovered concerning facts and practices relating to Sampson and his business. Specifically, the State's investigation prior to filing its Complaint uncovered numerous potential violations of Indiana law committed by

Sampson, including advertising and selling vehicles without a license, operating as a vehicle salvage recycler without a license, misrepresenting to consumers that Sampson was licensed when he was not, failing to title vehicles (i.e., "title jumping"), and making misrepresentations regarding the characteristics and quality of vehicles.

30. The State's investigation showed that Sampson had posted at least 21 vehicles for sale on Facebook Marketplace prior to deleting his Marketplace account after the State filed its Complaint. All of the vehicles on Marketplace were marked as sold. Sampson also had 22 reviews for vehicle sales on Facebook Marketplace. In a text message obtained by the State, Sampson also stated he buys and sells vehicles on Marketplace daily.

31. Sampson does not have a license to sell motor vehicles or watercraft pursuant to Indiana Code §§ 9-32-2.1-44 and 9-32-2.1-46. Despite not having a license to sell watercraft, Sampson represented in Facebook Marketplace advertisements that he was "licensed and insured" when he was not.

32. Sampson did not title in his name any of the vehicles he listed for sale or sold as required by Indiana law, and instead "title jumped" the vehicles by listing the previous owner as the seller. Such a practice allowed Sampson to avoid paying sales tax on his vehicles and created false title records for purchasing consumers and the Indiana Bureau of Motor Vehicles. Sampson admits to title jumping multiple jet skis in the narrative provided in his grievance.

33. Sampson also acts as a salvage recycler without a license in violation of Indiana Code § 9-32-11-1(a)(5). Sampson acquires wrecked jet skis, stores them on

his property, and sells the parts from the wrecked skis. Numerous jet skis being parted out were observed on Sampson's property by State of Indiana investigators as well as posted to Facebook Marketplace. Sampson also advertised the sale of parts from the jet skis on Marketplace without a proper license: "I have tons of Jetski parts for sale all makes and models …."

34. Sampson engaged in a consumer transaction with Todd Rokita. Sampson sold Rokita a jet ski using multiple false written representations, including representing the jet ski had a new rebuilt engine when it did not, that the jet ski had a new oil pump when it did not, and that the jet ski had a new crank when it did not. The deceptive statements made to Rokita are included in the State's Complaint against Sampson.

35. The State had highly compelling reasons to pursue the potential violations against Sampson when they became known to protect Indiana consumers, regardless of whether one of the victims was the Attorney General.

36. The State seeks to protect consumers by enjoining such potential violations from occurring in the future as well as pursuing civil penalties violations when they occur. The Attorney General has the *exclusive statutory authority* to seek such remedies. The State also is seeking consumer restitution for Rokita who was personally a victim of Sampson's misrepresentations and deceptive conduct during his consumer transactions with Sampson. One of the eleven counts in the State's Complaint pertains solely to Rokita's consumer transaction.

37. Sampson has litigated the substance of his grievance in the Fulton County Superior Court through his filing of a motion to disqualify the Attorney General's office and a motion to dismiss the action. The Fulton County Superior Court denied both motions. *See* Order at 3, *State v. Sampson*, No. 25D01-2512-PL-000903 (Ind. Super. Ct., Fulton Cnty. June 8, 2026), attached as Exhibit B. Among other things, the Court found that the "Plaintiff has stated a claim upon which relief can be granted"; that "[t]he AG is not an attorney of record for the Plaintiff's Complaint"; and that "[t]he actions and claims before this court do not violate the Indiana Rules of Professional Conduct." *Id.* (As to the last finding, the Court added in a footnote that "the Indiana Supreme Court Disciplinary Commission is the ultimate authority to determine in a violation [of the Indiana Rules of Professional Conduct] has occurred." *Id.* at 3 n.3.)

38. In a subsequent order, the Fulton County Superior Court struck a third-party complaint filed by Sampson against Rokita. *See* Order Granting Pl.'s Mot. to Strike Def.'s Third-Party Compl., *State v. Sampson*, No. 25D01-2512-PL-000903 (Ind. Super. Ct., Fulton Cnty. Aug. 17, 2026), attached as Exhibit C.

39. *State v. Sampson* is a pending case. The Commission's demand that General Rokita respond to the Sampson grievance improperly interferes with an ongoing civil action brought by the Attorney General's office on behalf of the State of Indiana.

### *The Commission's Pattern of Retaliatory and Harassing Grievances Against General Rokita for His Protected Speech*

40. The Commission's handling of the Sampson grievance is not the first time the Commission has handled a grievance against General Rokita in an abusive manner. Rather, it is the most recent in a long line of abuses.

41. As Indiana's elected Attorney General, General Rokita regularly speaks publicly on matters of significant public concern, including immigration enforcement, the enforcement of state consumer-protection and civil-rights laws, and litigation positions taken by his office. His public commentary on these subjects is core political speech at the heart of the First Amendment's protection.

42. Beginning in 2022, the Commission has pursued against General Rokita a series of grievances, most arising from his protected public statements, and has used the disciplinary process itself as an instrument of harassment.

43. **First grievance (July 2022).** Paula Cardoza-Jones is a licensed attorney and former staff attorney of the Indiana Supreme Court and the Commission. Cardoza-Jones filed a grievance with the Commission against Rokita despite lacking personal knowledge, and did so for political ends, and to prevent and hinder him from fulfilling his official duties regarding policy issues with which Cardoza-Jones disagrees. Cardoza-Jones filed a grievance over a sixteen-word statement General Rokita made on national television describing a physician as an "abortion activist acting as a doctor—with a history of failing to report." *In re Rokita*, 219 N.E.3d 733, 733 (Ind. 2023) (per curiam). The matter resulted in a public reprimand. *Id.* at 735.

44. **Second grievance.** David R. Hoffman is a licensed, inactive attorney in Indiana. Hoffman filed a grievance with the Commission against General Rokita for political ends and to prevent and hinder General Rokita from fulfilling his official duties regarding policy issues with which Hoffman disagrees. Hoffman, despite having no first-hand knowledge, complained of General Rokita's letters warning Fortune 500 companies that certain diversity, equity, and inclusion policies might violate the law after *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023). The Commission demanded a response and investigated for a full year before dismissing the grievance.

45. **Third grievance.** Cardoza-Jones filed again, complaining that General Rokita's public statements about his confidential agreement were false. The Commission dismissed identical allegations she leveled against the lawyers defending General Rokita, but kept open the grievance against him—a disparity that underscores the selective, political use of the disciplinary process.

46. **Fourth grievance.** William R. Groth is an attorney who describes himself as "representing and advocating for labor unions, employees, and other progressive causes" including "election law and other civil rights cases" and that he "is active in politics and won the Indiana Democratic Party's Activist of the Year Award in 2018." *William R. Groth, Esq.*, Bowman & Vlink, https://tinyurl.com/yy3z5wfp (last visited Sep. 23, 2026). Groth has been suing Rokita for decades. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd. & Rokita*, 553 U.S. 181 (2008) (complaint filed by Groth in 2005, *Ind. Democratic Party v. Rokita,* No. 1:05-

cv-0634-SEB-VSS (S.D. Ind.)). Groth filed at least three grievances with the Commission against Rokita despite lacking personal knowledge, and did so for political ends, and to prevent and hinder him from fulfilling his official duties regarding policy issues with which Groth disagrees. In the fourth grievance, Groth alleged that General Rokita showed "a total lack of contrition" regarding his prior statements.

47. **Fifth grievance.** A grievant objected to an *amicus* brief General Rokita filed in the U.S. Supreme Court in *Trump v. Anderson*, 601 U.S. 100 (2024), on behalf of Indiana and twenty-six other states. *See* Br. of *Amici Curiae*, No. 23-719, 2024 WL 113930 (U.S. Jan. 5, 2024). The Supreme Court unanimously adopted the position General Rokita advanced, yet the Commission took more than a month after that decision to dismiss the grievance.

48. **Sixth grievance.** Groth complained that General Rokita gave unsolicited legal advice affecting the Indiana Department of Health, when in fact he had issued a formal advisory opinion pursuant to his official duties. In 2025, the Commission notified the grievant that it had taken confidential "corrective action" against General Rokita based on this grievance for statements made at an April 2024 news conference—an adverse disciplinary measure imposed on account of his protected public speech.

49. **Seventh and eighth grievances.** The Commission then initiated two grievances of its own—one alleging that General Rokita reviewed or directed staff to

review the voting records and political-donation histories of prior grievants, and one alleging that he consulted a firm regarding a press release.

50. **The second disciplinary complaint (No. 25S-DI-29).** The Commission pressed a further complaint contending that General Rokita's public statements about his first reprimand showed a lack of candor. Even the Indiana Supreme Court observed that "when our state's highest court must enlist our profession's most respected leaders as hearing officers to litigate at considerable expense whether our state's attorney general was sincere when saying sorry, we're in a hole." Opinion at 15, *In re Rokita*, No. 25S-DI-29 (Ind. 2025) (Molter, J.). That matter has since concluded. No state disciplinary proceeding against General Rokita remains pending other than the Sampson grievance described below.

51. **The Liz Brown grievance (May 2025).** After General Rokita publicly discussed Indiana state Senator Elizabeth M. Brown's role in blocking immigration-enforcement legislation, she filed a grievance accusing him of professional misconduct. Rather than dismiss a grievance that raised no substantial question of misconduct, the Commission demanded that General Rokita respond on pain of investigation and discipline. After the Commission received General Rokita's Verified Petition for a Writ of Mandamus and Prohibition submitted by him to the Indiana Supreme Court, the Commission closed the matter.

52. **The Jess Sampson grievance (Dec. 2025) (Disciplinary Comm'n Matter No. 26-1114)**. The pending Sampson grievance is the latest meritless grievance to be indulged by the Commission and its Executive Director.

***The Commission's Recurring Method, Including Selective Treatment and Evidence of Bad Faith***

53. Across these matters the Commission has followed a consistent method: It demands a response to a facially meritless grievance; it opens an investigation that runs for the maximum period the rules permit; it declines, in the end, to bring charges; and it publicizes the pendency of the matter throughout, inflicting reputational harm. The Commission has, in effect, held meritless grievances open to keep General Rokita "under a microscope."

54. The Commission acts only through its Members. Under the Commission's Rules and its consistent practice, no grievance advances beyond intake without action attributable to the Members. The Executive Director may dismiss a grievance for want of a substantial question of misconduct only "with subsequent approval by the Disciplinary Commission," Ind. Admis. Disc. R. 23(10)(a)(1). No matter is docketed as a formal disciplinary proceeding, and no formal complaint is filed, without the Commission's authorization by vote of its Members. *Id.* R. 23(11). Even "the mere act of voting" under these circumstances is sufficient to allege First Amendment retaliation against Defendants. *See, e.g.*, *Comsys, Inc. v. City of Kenosha,* 223 F. Supp. 3d 792, 806–07, 810–11 (E.D. Wis. 2016).

55. At each such decision point in the matters described above, the Members named as Defendants voted for or approved the decision to demand a response to, to prolong the investigation of, to authorize corrective action on, or to continue rather than dismiss each facially meritless grievance against General Rokita. And they did

so with knowledge of the protected speech and petitioning that prompted each grievance and for the purpose of retaliating against General Rokita for it.

56. The Commission has further treated any perceived shortcoming in General Rokita's cooperation as a pretext for additional, independent grievances, compounding the burden and the in terrorem effect of the process.

57. The Commission has administered this process selectively and with evident political animus. It dismissed against General Rokita's own lawyers the very allegations it kept open against him.

58. Commissioner Bernard A. Carter, a longtime elected Democratic prosecutor, made numerous donations to Democrat candidates and publicly endorsed General Rokita's opponent, Destiny Wells, and hosted a "Meet and Greet" for her while the Commission, including Carter, was investigating General Rokita. In Wells' campaign advertisements, she highlighted the disciplinary matters related to General Rokita. Put another way, a sitting Member of the Commission was investigating General Rokita while also actively campaigning for his opponent, who highlighted General Rokita's disciplinary actions on the campaign trail. Of course, this created an obvious appearance of impropriety.

59. Grievances were entertained and publicized during General Rokita's re-election campaign, amplifying their retaliatory effect.

60. The stream of grievances has continued into the current limitations period. In October 2024, an attorney filed a grievance over General Rokita's statements during a televised campaign debate; in April 2025, a member of the public

filed a grievance over a social-media post; and in May 2025, the State Senator filed the grievance described above—each arising from General Rokita's protected speech.

61. The Commission's course of conduct is undertaken in bad faith and for the purpose of harassment. The Commission has repeatedly demanded responses to, and opened maximum-length investigations into, grievances it knew or should have known were facially meritless; it has held those grievances open and publicized them regardless of their ultimate disposition; it has treated General Rokita's protected speech and his perceived non-cooperation as occasions for new grievances; and it has administered the process selectively, dismissing against others the very allegations it pursued against him. The Commission has used the disciplinary process itself—as opposed to any legitimate disciplinary outcome—to retaliate against and burden General Rokita for his protected speech.

62. The selectivity of the Commission's treatment of General Rokita is stark. In 2023, General Rokita was the only Indiana lawyer disciplined solely for speech, while the Commission's other discipline in that period involved felony and misdemeanor convictions, possession of child pornography, sexual misconduct with a client, injuring a person while driving drunk, theft of client funds, and knowingly false statements to courts.

***Public Disclosure of Confidential Proceedings***

63. Although the Commission's proceedings are confidential, grievances against General Rokita have repeatedly and quickly been made public, damaging his reputation while he remained constrained by confidentiality rules from responding.

64. Under the Commission's Rule 23, the Commission's grievances and investigations are confidential and are not to be disclosed to the public unless and until the Commission files a formal disciplinary complaint. *See* Ind. Admis. Disc. R. 23(22)(a)(3). Yet confidential proceedings were disclosed to the public, which means that one or more of the Commission Defendants, the Former Commissioners, or their staff caused, permitted, or facilitated the public disclosure of confidential grievance and investigation materials concerning General Rokita, for the purpose and with the effect of inflicting reputational harm. Discovery will identify which person or persons from this limited group disclosed the confidential information.

65. The mechanism of disclosure was the Commission's own practice. Although not required to do so, the Commission notified grievants that their complaints were under investigation by copying them on its correspondence with General Rokita, and the grievants in turn leaked those communications to the press.

66. Grievants Cardoza-Jones and Groth publicly revealed the grievances they had filed and told the press that the Commission was investigating them, and Cardoza-Jones publicly disclosed the Commission's dismissal of the companion grievances against General Rokita's own attorneys.

67. The disclosure of General Rokita's confidential second investigation just two months before the November 2024 election is illustrative. On September 4, 2024, the Indiana Supreme Court entered an order granting the Commission ninety-day extensions to complete its investigations in "matters 24-0618 and 24-0608." That order did not name General Rokita and referred only to the file numbers.

Nonetheless, the confidential investigation was reported by *The Indiana Citizen* after Cardoza-Jones and Groth analyzed their correspondence from the Commission, identified the file numbers as General Rokita's second disciplinary investigation, and confirmed as much to the press. General Rokita first learned of the leak through the resulting press inquiries.

***The Grievants' Coordination with the Commission***

68. The recurring grievants and the Commission have acted in concert. Grievants have publicized their confidential grievances without consequence, and the Commission has entertained, prolonged, and publicized those grievances, each understanding that the disciplinary process would be used to embarrass and burden General Rokita for his protected speech.

69. Defendants Cardoza-Jones and Groth are among the recurring grievants who so acted, filing successive grievances arising from General Rokita's protected speech and coordinating with Commission personnel in their prosecution and publicity.

***General Rokita's Injuries and Inadequacy of State Court Relief***

70. The Commission Defendants' conduct has injured General Rokita by damaging his personal and professional reputation, diverting his time and the resources of his office, causing substantial expense to Indiana taxpayers, and chilling his exercise of protected speech.

71. Defendants' retaliatory conduct has caused and continues to cause great and unnecessary expense to Indiana taxpayers. Between 2022 and 2025, the State paid four outside law firms a combined $491,508 to defend General Rokita in at least

six separate matters before the Commission, only two of which resulted in formal disciplinary charges.

72. The Commission's weaponization of frivolous grievances threatens to create a severe chilling effect on public discourse and debate in Indiana, contrary to the First Amendment. For General Rokita, *the process is the punishment*.

73. At a minimum, the Commission Defendants' conduct has completed a violation of General Rokita's First Amendment rights, for which he is entitled to at least nominal damages if not substantial tort damages. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021).

74. General Rokita brings this action in federal court because no state court can be expected to provide the relief he seeks. The Commission's rules, promulgated by the Indiana Supreme Court, purport to make grievants "absolutely immune" from suit, Ind. Admis. Disc. R. 23(25)(a), and to immunize Commission members and the Executive Director from suit "for any conduct arising out of the performance of their duties." *Id*. R. 23(25)(b).

75. The Indiana Supreme Court lacks authority to immunize its Commission, its members, or its Executive Director from suit for violations of the First Amendment or other federal law, but lower Indiana courts can be expected to follow the Indiana Supreme Court's rules. Only a federal court can grant Rokita complete relief.

## CLAIMS FOR RELIEF

### COUNT I
### First Amendment Retaliation—Protected Speech, 42 U.S.C. § 1983
### (*Against Commission Defendants in their official capacities for declaratory and injunctive relief*)

76. General Rokita realleges and incorporates by reference Paragraphs 1 through 75.

77. The First Amendment, applied to the States through the Fourteenth Amendment, prohibits government officials from retaliating against a person for engaging in protected speech. To establish First Amendment retaliation, a plaintiff must show that he engaged in protected activity, that he suffered a deprivation likely to deter a person of ordinary firmness from continuing to engage in protected activity, and that his protected activity was at least a motivating factor in the defendants' action. *Gekas v. Vasiliades*, 814 F.3d 890, 895 (7th Cir. 2016).

78. General Rokita engaged in protected activity when he spoke publicly on matters of public concern, including immigration policy, the enforcement of Indiana law, and his office's litigation positions.

79. "The First Amendment surely promises an elected representative … the right to speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022). Indeed, "[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Republican Party of Minn. v. White*, 536 U.S. 765, 781–82 (2002) (quoting *Wood v. Georgia,* 370 U.S. 375, 395 (1962)).

80. The Commission Defendants took adverse action against General Rokita by demanding responses to facially meritless grievances on pain of discipline, opening and prolonging investigations, and subjecting him to the coercive threat of professional sanction, including suspension of his law license. Such an official campaign of investigation and reputational injury would deter a person of ordinary firmness from continuing to speak. *See Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). The Seventh Circuit has held that "[t]his is an objective standard; it does not hinge on the personal experience of the plaintiff." *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).

81. General Rokita's protected speech was a motivating factor in the Commission Defendants' conduct, as shown by the pattern of grievances tied to his public statements, the disparate treatment of similarly situated attorneys, and the political partisanship of Commission members.

82. Where, as here, the retaliatory action includes official conduct that threatens sanction, it is actionable under § 1983. *Novoselsky v. Brown*, 822 F.3d 342, 356–57 (7th Cir. 2016).

83. The U.S. Supreme Court has made clear that "the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys.*, 595 U.S. at 474 (cleaned up); *see also Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech.").

84. The Seventh Circuit and other Courts of Appeals have reaffirmed this basic principle. "Any form of official retaliation for exercising one's freedom of speech is actionable as an infringement of that freedom." *Smart v. Bd. of Trs. of Univ. of Ill.*, 34 F.3d 432, 434 (7th Cir. 1994) (collecting cases). "Since the day the ink dried on the Bill of Rights, the right of an American citizen to criticize public officials and policies is the central meaning of the First Amendment. There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment." *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001) (cleaned up).

85. Federal appeals courts have likewise recognized that "the First Amendment right to criticize public officials is well-established" and that "a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997); *see also Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (en banc) (holding that "an investigation conducted in retaliation for comments protected by the first amendment could be actionable under section 1983"), *abrogated in part on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004).

86. As a direct and proximate result of the Commission Defendants' speech-based retaliation, General Rokita has suffered the injuries described above and is entitled to declaratory and injunctive relief against the Commission Defendants in their official capacities. Nominal, compensatory, and punitive damages for the

retaliatory public disclosure of confidential proceedings are sought against the Defendants in their individual capacities in Count III.

**COUNT II**
**First Amendment Retaliation—Protected Petitioning, 42 U.S.C. § 1983**
**(*Against the Commission Defendants in their official capacities for declaratory and injunctive relief*)**

87. General Rokita realleges and incorporates by reference Paragraphs 1 through 86.

88. The First Amendment protects not only speech but also the right of the people to petition the Government for a redress of grievances, and retaliation for protected petitioning is actionable under § 1983 under the same framework that governs speech-based retaliation. *Hagan v. Quinn*, 867 F.3d 816, 822–23 (7th Cir. 2017).

89. The right to petition extends to all departments of government, including the executive, administrative agencies, and the courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *McDonald v. Smith*, 472 U.S. 479, 482 (1985). Reporting suspected unlawful conduct to a government enforcement agency, and invoking that agency's and the courts' processes, is protected petitioning activity. *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 650 (7th Cir. 1983).

90. General Rokita engaged in protected petitioning when, as a consumer and the victim of a deceptive jet-ski transaction, a matter of public concern, he brought his concerns to the Consumer Protection Division of the Office of the Attorney General, and when he participated as a victim and witness in the resulting enforcement action, *State of Indiana v. Sampson*, No. 25D01-2512-PL-000903 (Ind.

Super. Ct. Fulton Cnty.). This petitioning was General Rokita's own; he is not counsel of record in that action. *Cf. 145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766–67 (7th Cir. 2021) (the right to be free from retaliation for petitioning runs to the person who petitioned).

91. General Rokita also engaged in protected petitioning when he publicly petitioned the Indiana Supreme Court and the public to reform the attorney-discipline rules to guard against politically motivated grievances.

92. The Commission Defendants took adverse action against General Rokita's petitioning by entertaining, and demanding a response on pain of discipline to, the Sampson grievance—filed by the very party his office was prosecuting and accusing General Rokita of misusing his office by pursuing that matter—and by setting the same investigative machinery in motion. Such action would deter a person of ordinary firmness from continuing to petition.

93. General Rokita's protected petitioning was a motivating factor in the Commission Defendants' decision to entertain, and require General Rokita to respond to, the Sampson grievance.

94. As a direct and proximate result of the Commission Defendants' petition-based retaliation, General Rokita is entitled to declaratory and injunctive relief against the Commission Defendants in their official capacities. Nominal damages for the completed violation are sought against the Defendants in their individual capacities in Count III.

**COUNT III**
**First Amendment Retaliation—Public Disclosure of Confidential Proceedings, 42 U.S.C. § 1983**
**(*Against the Commission Defendants and the Former Commissioners in their individual capacities for damages*)**

95. General Rokita realleges and incorporates by reference Paragraphs 1 through 94.

96. The public disclosure of confidential disciplinary proceedings was itself a retaliatory adverse action. One or more of the Commission Defendants, the Former Commissioners, or their staff caused, permitted, or facilitated the public disclosure of confidential grievance and investigation materials concerning General Rokita because of his protected speech and petitioning, inflicting reputational harm and thereby deterring the exercise of his First Amendment rights. *Gekas*, 814 F.3d at 895.

97. The disclosure of confidential proceedings would deter a person of ordinary firmness from continuing to speak and to petition, and General Rokita's protected speech and petitioning were a motivating factor in the disclosures.

98. As a direct and proximate result of the retaliatory disclosures, General Rokita has suffered reputational and other injury and is entitled to compensatory, nominal, and punitive damages against the Commission Defendants and the Former Commissioners in their individual capacities.

99. The individual-capacity damages sought in this Count are confined to the Defendants' disclosure of confidential grievance and investigation materials to the public, and no immunity bars them. Absolute quasi-judicial immunity from damages extends only to functions intimately associated with the adjudicative process—here, the Commissioners' and Executive Director's decisions to entertain,

investigate, charge, and adjudicate grievances. *See Kissell v. Breskow*, 579 F.2d 425, 430–31 (7th Cir. 1978) (per curiam) (executive secretary of the Indiana disciplinary commission absolutely immune for determining to file, filing, and presenting a grievance to the Commission). Whether such immunity attaches turns on the character of the conduct, not the actor's motive, and it does not reach acts that are administrative or investigative rather than quasi-judicial, *id*. at 430; *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

100. The disclosure of confidential proceedings to the press is not an adjudicative act. Like a prosecutor's out-of-court statements to the media, it enjoys at most qualified immunity and no absolute immunity. *Buckley*, 509 U.S. at 277–78. Nor does qualified immunity shield it, because the deliberate disclosure of confidential disciplinary proceedings to retaliate against clearly established First Amendment-protected speech violates rights of which any reasonable official would have known.

**COUNT IV**
**Fourteenth Amendment—Deprivation of Liberty and/or Property Without Due Process of Law, 42 U.S.C. § 1983**
**(*Against Commission Defendants in their official capacities for declaratory and injunctive relief*)**

101. General Rokita realleges and incorporates by reference paragraphs 1 through 100.

102. The Commission had no proper or lawful basis to demand that General Rokita respond substantively to the Sampson grievance.

103. Neither the Commission's July 29, 2026 letter to General Rokita nor the Sampson grievance itself cited any of the Indiana Rules of Professional Responsibility that General Rokita allegedly violated. *See* Ex. A.

104. Contrary to its own rules, the Commission demanded that General Rokita respond to the Sampson grievance even though it does not raise a "substantial question of misconduct." *See* Ind. Admis. Disc. R. 23(10)(a).

105. By demanding that General Rokita respond in writing to the plainly insubstantial Sampson grievance on pain of having his Indiana law license suspended and other discipline imposed, the Commission violated his constitutional right to be free from governmental deprivations of liberty or property without due process of law. *See* U.S. Const. amend. XIV, § 1, cl. 3; *Easter House v. Felder*, 910 F.2d 1387, 1407 (7th Cir. 1990) (en banc) ("Clearly, an unwarranted investigation by licensing officials conducted in a manner calculated to discourage customers or interfere with a licensee's business may violate a property right.").

106. The Commission's investigation of the meritless Sampson grievance is unwarranted and interferes with the performance of General Rokita's duties as Attorney General.

**COUNT V**
**Declaratory Judgment, 28 U.S.C. § 2201(a)**
**(*Against Commission Defendants*)**

107. General Rokita realleges and incorporates by reference paragraphs 1 through 106.

108. An actual controversy exists between General Rokita and the Commission Defendants concerning whether the Commission's pattern of demanding responses to, investigating, publicizing, and disclosing facially meritless grievances against General Rokita in retaliation for his protected speech violates the First Amendment.

109. General Rokita is entitled to a declaration that the Commission's pattern of conduct, including the public disclosure of confidential proceedings, violates the First Amendment, and to an injunction restraining its continuation.

## PRAYER FOR RELIEF

WHEREFORE, General Rokita respectfully requests that the Court:

a. Enter judgment declaring that the Commission's pattern of retaliatory and harassing conduct, including the disclosure of confidential proceedings, violates the First Amendment;

b. Enter judgment declaring that General Rokita need not respond to the Sampson grievance because requiring him to respond would violate the First Amendment;

c. Preliminarily and permanently enjoin the Commission Defendants, in their official capacities, from continuing that pattern of conduct, including from processing grievances against General Rokita in retaliation for his protected speech and from disclosing confidential proceedings;

d. Award compensatory damages against the Commission Defendants and Former Commissioners in their individual capacities for the reputational and other injuries caused by their disclosure of confidential proceedings;

e. Award nominal damages against the Commission Defendants and Former Commissioners in their individual capacities for the violation of General Rokita's First Amendment rights;

f. Award punitive damages against the Commission Defendants and Former Commissioners in their individual capacities for their disclosure of confidential proceedings in reckless or callous indifference to General Rokita's constitutional rights;

g. Award General Rokita his reasonable attorneys' fees and costs under 42 U.S.C. § 1988(b); and

h. Grant any other relief that the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiff demands a jury trial on any issue triable of right by a jury.

Respectfully submitted,

*/s/ Paul O. Mullin*
Paul O. Mullin
Indiana Bar No. 25896-49
E. Ryan Shouse
Indiana Bar No. 35597-49
Lewis and Wilkins LLP
8777 Purdue Road, Suite 104
Indianapolis, IN 46268-3104
Telephone: (317) 636-7460
Facsimile: (317) 636-7505
mullin@lewisandwilkins.com
shouse@lewisandwilkins.com

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
D.C. Bar No. 416368
H. Christopher Bartolomucci*
D.C. Bar No. 453423
Justin A. Miller**
D.C. Bar No. 90022870
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

* Admitted to practice in the U.S. District Court for the Southern District of Indiana

** *Pro hac vice* application forthcoming

*Counsel for Plaintiff Theodore E. Rokita*

Dated: October 1, 2026